**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **ANNA ODOM,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:12-CV-91 (HL) |
| **FRED'S STORES OF TENNESSEE, INC.**, | |
| Defendant. | |

**ORDER**

Before the Court is the Motion for Summary Judgment (Doc. 27) filed by Defendant Fred's Stores of Tennessee, Inc. ("Fred's"). For the reasons stated below, Fred's motion is granted.

**I.    Factual Background**

This case arises from the sexual harassment Plaintiff Anna Odom ("Plaintiff") is alleged to have suffered at the hands of her supervisor Clay Suggs ("Suggs") from November 2011 until February 2012 when Plaintiff was working at the Fred's store in Moultrie, Georgia. The factual record, seen in the light most favorable to Plaintiff, shows that Fred's hired Plaintiff on November 2, 2011 to work as a sales associate at the new store it was opening in Moultrie. As manager of the store, Suggs was Plaintiff's primary supervisor, although she also reported to an assistant manager. (Deposition of Plaintiff, Doc. 28-5, pp. 78, 84).

The Fred's store in Moultrie was one of sixteen stores in Georgia and Florida overseen by the regional manager Bob Langreder ("Langreder"), who would visit the Moultrie location weekly or biweekly. Langreder lives in and works out of Albany, Georgia. (Declaration of Robert "Bob" Langreder, Doc. 27-4, ¶¶2-4).

Although Plaintiff was hired to be a general sales associate, she hoped to eventually qualify as an apparel expert and work with Fred's clothing products. After being hired, she repeatedly requested to take the examination to become an apparel expert, but she was never given the opportunity to do so. During her employment at Fred's, Suggs only allowed one employee to take the examination to qualify as an expert and that was in the area of operations. (Doc. 28-5, pp. 68-72, 116-17).  Despite her disappointment over not being an apparel expert, Plaintiff generally thought Suggs was very nice and that she received better treatment than other employees did. She was never disciplined at Fred's, and her verbal counseling was always positive. (Id. at 93-94, 115-16).

During the time of Plaintiff's employment, Fred's had a formal policy prohibiting sexual harassment and employment discrimination and instructing employees on how to report harassment or discrimination. Under the policy's guidelines for employees, "if your supervisor is the alleged harasser, then notify your District Manager, Vice President of Human Resources-Store Operation or Vice President-Loss Prevention." (Fred's Policy Prohibiting Sexual Harassment

and Employment Discrimination, Ex. 7 to Plaintiff's Deposition, Doc. 32-2, pp. 65-66). The policy listed the phone numbers for these individuals and also provided an "Integrity Hotline" with a phone number employees could call to make complaints. Written complaints could also be sent to the Vice President of Human Resources-Store Operation at a listed address. Fred's policy assured its employees that it would take reports of harassment seriously, maintain the confidentiality of complainants if at all possible, and protect good faith complainants from retaliation. When Fred's hired Plaintiff, she received a copy of the anti-harassment policy and signed a statement acknowledging she had read the policy. (Id.; Doc. 28-5, pp. 88-89, 91-92).

After Plaintiff began working at Fred's, Suggs began to demonstrate that he found Plaintiff attractive. Although Plaintiff has broadly alleged that Suggs would "[s]ay something out of the way" to her "every day," during her deposition she could only recall some of these instances and only rarely the precise dates when they occurred. (Id. at 95, 100). On Plaintiff's first or second day of working at Fred's, Suggs called her a "hot mama" in the presence of another employee. (Id. at 98-99). Suggs once told Plaintiff she was pretty and, on another occasion, said he was glad to have somebody to look at every day. He commented on her clothes and the way she walked. He mentioned to Plaintiff that he likes bow-legged women, and Plaintiff is bow-legged. (Id. at 94, 96, 104-06).

Suggs enjoyed sharing sexually-tinged jokes with Plaintiff. One day, in reference to something she was working on, Plaintiff asked Suggs "do you want me to put it in there?" He responded, "That's what she said," and then laughed. (Id. at 95). Another day Suggs and Plaintiff were in his office with the door closed while Plaintiff looked for a tag gun, and he said something like "somebody's going to think that we're doing something nasty in here with each other. You better hurry up and find what you want before something happens." (Id. at 101). He spoke with "a weird facial expression," and at the time Plaintiff perceived his comment as being made "jokingly" and "just laughed it off." (Id. at 101, 104).

Plaintiff also alleges that Suggs' work supervision of her reflected his inappropriate interest. He arranged their work schedules so they would have the same shifts. (Id. at 77, 114). Out of all the female employees at Fred's only the Plaintiff was required to assist Suggs in unloading boxes from delivery trucks, which happened once a week, and as they handed boxes to each other his hands would sometimes brush her stomach or hand. At the time this occurred Plaintiff "thought it was just because he was grabbing the boxes" and did not think Suggs was harassing her. (Id. at 97-98). After Plaintiff had had multiple male friends come to the store to visit with her while she was working, Suggs called Plaintiff on her cell phone to say that her friends needed to leave her alone. (Id. at 100, 102).

4

Suggs discussed his own marital unhappiness with Plaintiff. Suggs told Plaintiff about the trouble he and his wife were having and the fights that would occur. He said his wife was jealous of Plaintiff and would sometimes ask him not to go to work if she knew Plaintiff would also be working that shift. (Id. at 96, 100). This marital jealousy is what eventually precipitated Plaintiff's departure from Fred's. Around 11 p.m. on February 7, 2012, Plaintiff was feeding one of her children at home when she received a telephone call from Suggs' wife. In a profane rant, Suggs' wife called Plaintiff a "whore," said she needed "to watch [her] back at work," and advised "that the best thing [she could] do is not go back to work" because Suggs' wife had a cousin who would keep an eye on Plaintiff at Fred's. (Id. at 107-08). The call upset Plaintiff, but she was somewhat reassured after discussing it with her husband and two co-workers. (Id. at 109-10).

Not heeding the warnings of Suggs' wife, Plaintiff went to work the next day for her regular shift. She quickly realized that she and Suggs had become the targets of excited workplace gossip. Multiple co-workers came up and wanted to know if there was any truth to the jokes about her and Suggs being in a sexual relationship. (Id. at 110-12). Soon after Plaintiff arrived at Fred's and began working the day after the telephone call from Suggs' wife, Suggs walked up and leaned over to her, saying that "the best thing that you can do is to keep your mouth shut about it." Plaintiff responded, "yes, sir," understanding him to be

referring to the telephone call from his wife.[1] (Id. at 110-11). Embarrassed by her co-workers' continued inquiries into her rumored relationship with Suggs, Plaintiff went home at the end of her shift and never returned, making February 8, 2012 her last day of work at Fred's. (Id. at 112-13).

After returning home, Plaintiff decided for the first time to make Fred's aware of Suggs' behavior. Although knowing that Bob Langreder only visited the Moultrie store once or twice a week, Plaintiff left a message for him at that store. Calling Fred's on February 8 and speaking with a female employee whose identity she cannot recall, Plaintiff said, "Please when Bob comes, can you please get—tell him to give me a call. This is Anna Odom. I really need to speak with him." (Id. at 89-91, 113-15). Langreder never received this message and never learned that Plaintiff perceived Suggs as harassing her. (Doc. 27-4, ¶5).

Never hearing back from Langreder, Plaintiff filed a complaint with the Equal Employment Opportunity Commission and, after receiving a right to sue letter, brought this lawsuit against Fred's. She seeks damages for her claims of sex discrimination in the form of sexual harassment, constructive discharge, and retaliation. (Plaintiff's Amended Complaint, Doc. 5, ¶¶21-25).

---

[1] This is how Plaintiff described the conversation during her deposition. In response to Fred's summary judgment motion, Plaintiff has now provided a declaration that contains some key differences in what Suggs supposedly said and what Plaintiff understood him to mean. The Court will address these differences and their legal significance below.

## II.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and…the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex,

477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### III.    Legal Analysis

Plaintiff has filed claims for sexual harassment constituting discrimination, constructive discharge, and retaliation, but Fred's motion for summary judgment must be granted on all these claims.

### A.    Sexual Harassment Claim

Because no genuine issue of material facts exists and Fred's is entitled to judgment as a matter of law on Plaintiff's sexual harassment claim, Fred's motion for summary judgment on this claim is granted. Title VII of the Civil Rights Act ("Title VII") prohibits covered employers from discriminating against any individual on the basis of that person's sex with regards to the terms, compensation, privileges, or conditions of employment. 42 U.S.C. § 2000e-

2(a)(1). While Title VII's prohibition of sex discrimination does encompass sexual harassment, "Title VII is not a 'civility code.'" <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citing <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). "Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment." <u>Id.</u>

Unlike other types of harassment also rising to the level of sex discrimination, hostile work environment sexual harassment does not involve some tangible employment action against the victim of harassment. <u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 508 (11th Cir. 2000) (citing <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 760-63, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Thus, a supervisor could engage in sexual harassment by creating a hostile work environment even though the employee does not suffer reduced pay or a demotion. <u>Id.</u> To establish a *prima facie* case for sexual harassment creating a hostile work environment,[2] Plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual

---

[2] In her complaint and amended complaint, Plaintiff has not categorized her sexual harassment claim as either a *quid pro quo* or a hostile work environment claim. In its motion for summary judgment, Fred's assumes Plaintiff has alleged a hostile work environment claim; Plaintiff's response does not dispute this assumption; and certainly the factual allegations would seem to support a hostile work environment claim rather than a *quid pro quo* claim. In any case, the distinction between the two types of sexual harassment has largely vanished for purposes of legal analysis. *See* <u>Pipkins v. City of Temple Terrace, Fla.</u>, 267 F.3d 1197, 1199-1200 (11th Cir. 2001).

harassment; (3) the harassment was based on her sex; (4) "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) there is a basis for holding Fred's liable.[3] <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 808 (11th Cir. 2010) (quoting <u>Mendoza</u>, 195 F.3d at 1245). Fred's contends Plaintiff has failed to establish both the fourth and fifth elements.

### 1.   Whether Suggs' behavior was sufficiently severe or pervasive

Fred's is entitled to summary judgment on Plaintiff's sexual harassment claim because she has not shown that her supervisor's harassment was so severe or pervasive as to alter the terms or conditions of her employment and create a hostile work environment. There is both a subjective and an objective component to the determination of whether harassing conduct was sufficiently pervasive or severe to alter the terms or conditions of a plaintiff's employment. <u>Mendoza</u>, 195 F.3d at 1246 (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). An employee must "subjectively perceive" the conduct as sufficiently severe or pervasive as to alter the terms or

---

[3] Although when referring to these five steps the Eleventh Circuit has used both "factors" and "elements" terminology, its legal analysis has treated them as forming an elements test, so that if a plaintiff cannot establish even one of the steps her sexual harassment claim is lost. *See, e.g.*, <u>Johnson</u>, 234 F.3d at 508 (applying them as "factors"); <u>Succar v. Dade Cnty. School Bd.</u>, 229 F.3d 1343, 1344-45 (11th Cir. 2000) (employing the term "elements").

conditions of her employment, and this perception must be objectively reasonable. Id. (internal quotation and citation omitted).

The objective component of the analysis is fact intensive as it requires a court to consider four factors in determining whether the harassing conduct objectively altered the terms or conditions of employment. Id. These factors are "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. Courts must "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of" employment. Id.

Looking first at the subjective component, the Court finds that Plaintiff subjectively perceived Suggs' harassing behavior as being so severe and pervasive that it altered the terms and conditions of her job at Fred's. After Plaintiff's interactions with Suggs culminated in his wife calling to threaten her, she had to endure nosy questions from co-workers about her relationship with Suggs when she returned to work the next day. Suggs also cautioned her to keep quiet about the telephone call from his wife. Feeling "completely embarrassed" and "so upset by all of it," Plaintiff left her job at Fred's and never

returned. (Doc. 28-5, p. 112; Declaration of Anna Odom, Doc. 28-4, ¶6). Plaintiff hoped that leaving her job would reassure her husband that she was not having an affair with Suggs. (Doc. 28-5, pp. 119-20). She thought Suggs' attentions had placed her in an untenable position at work and in her marriage.

When viewed objectively, however, the factual record does not convince the Court that the harassment was sufficiently severe or pervasive to alter the terms or conditions of Plaintiff's employment at Fred's. Considering first the severity of Suggs' conduct, the Court finds that this factor does not support the conclusion that his harassment was sufficient to alter the terms or conditions of Plaintiff's employment. In examining Suggs' behavior, the Court will only consider the factual allegations that are of "a sexual or gender-related nature" and exclude those "that do not relate to the sex of the actor or of the offended party." Gupta v. Fl. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (overruled on other grounds by Crawford v. Carroll, 529 F.3d 961, 973-74 (11th Cir. 2008)). Many of the episodes Plaintiff describes as harassing were neither sexual nor gender-related. Suggs had an interest in preserving workplace efficiency as Plaintiff's supervisor, and his instruction for her to stop visiting with male friends at work served that end. Suggs' assigning Plaintiff to help him unload the delivery truck, regardless of his subjective motivations in doing so, can hardly be seen as objectively sexual in nature since such work presumably fell within her job

description and even she thought nothing of it at the time. (Doc. 28-5, pp. 97-98). And try as it might, the Court is unable to find anything sexual in the scheduling of Plaintiff's work shifts.

Similarly, Suggs' instruction for Plaintiff to keep quiet about the telephone call from his wife did not relate to sex or Plaintiff's gender, although the conflicting evidence in the record must be clarified. Plaintiff testified during her deposition that Suggs leaned over the counter and said the following: "the best thing that you can do is keep your mouth shut about it." (Doc. 28-5, p. 110). Fred's attorney then repeated Suggs' wording and asked Plaintiff to confirm that he correctly understood the remark. Plaintiff confirmed that the attorney had correctly stated the comment and said she understood Suggs to be referring to the telephone call she received from his wife. (Doc. 28-5, pp. 110-11). Thereafter, Plaintiff filed a sworn statement significantly altering Sugg's wording as follows: "I was at work at the cash register when Clay leaned over and whispered in my ear for me to 'keep my fucking mouth shut about his wife calling me and about everything that has happened.'" (Doc. 28-4, ¶4). In ruling on Fred's summary judgment motion, the Court is not required to consider the declaration to the extent it conflicts with Plaintiff's prior deposition testimony and will not do so. *See* Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008); Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).

The Court concludes that an objective individual in Plaintiff's position would have perceived Suggs' comment as related in the deposition as nothing more than an understandable attempt to discourage further gossiping.

Plaintiff's remaining allegations of harassment, even if sexual in nature, were not severe enough to alter the terms or conditions of her employment. On the occasion when Plaintiff was with Suggs in his office looking for a tag gun, his comment that she should work quickly since other employees might wonder what they were doing behind closed doors can only be seen as either a joke or a proper concern to avoid workplace gossip. The other allegations consist of Suggs' off-color jokes, awkward compliments, and inappropriate comments about Plaintiff's physical condition and his own marital troubles, statements the Supreme Court has described as "ordinary tribulations of the workplace" that are not prohibited by Title VII. Faragher v. City of Boca Raton, 524 U.S. 774, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation and citation omitted); see also Oncale, 523 U.S. at 81. However vulgar or inappropriate, the Court can only conclude that Suggs' conduct was not severe compared to other cases. See, e.g., Mitchell v. Pope, 189 F. App'x 911, 913-14 (11th Cir. 2006) (deciding the plaintiff had not been subjected to a hostile work environment although over a period of four years the offender had made sixteen "offensive utterances" to the plaintiff, chased her around the office, picked her up over his head, rubbed up

against her body, put his arm across her chest, whispered in her ear, and simulated "humping" a different female employee); <u>Gupta</u>, 212 F.3d at 578-79, 586 (concluding behavior was not severe or pervasive that occurred over six or seven months and included the harasser looking the plaintiff "up and down," staring at her legs, taking her to a singles bar, calling her at home at night multiple times a week, asking her to lunch, touching her thigh, touching a ring and bracelet she was wearing, lifting the hem of her dress, saying she looked "very beautiful," observing that she was "innocent" and "do[es]n't have much experience," and stating he would have spent the night with her during a bad storm); <u>Dorsey v. Fulton County</u>, Civ. Action No. 1:10-cv-679, 2012 WL 3871921, at *11 (N.D.Ga. Aug. 1, 2012) (finding a supervisor's questions about the plaintiff's willingness to "mess around," inquiries about whether she found him attractive, efforts to obtain her home address, requests for her to come alone to his office without stating any business purpose, and  comments that he had an "open marriage" were no more than "intersexual flirtation").

Nor does the factor of physically threatening or humiliating conduct tilt the evidence in favor of Plaintiff's claim. The only alleged instance of touching occurred when Suggs' hands sometimes brushed Plaintiff's hands or stomach as they handed boxes back and forth in unloading delivery trucks at Fred's. When Suggs' hands brushed her, Plaintiff "thought it was just because he was grabbing

the boxes" and did not view it as harassment. (Doc. 28-5, pp. 97-98). The Court finds that an objective person in Plaintiff's position would likewise not perceive such incidental touching as threatening or humiliating. Moreover, while Plaintiff did experience embarrassment on her last day of work, this was the result of her co-workers' questions and speculations about her relationship with Suggs, not a direct physical confrontation with her supervisor. Suggs did not do anything a reasonable person would see as physically threatening or physically humiliating.

The Court finds that the factor of whether Suggs' behavior affected Plaintiff's job performance also supports Fred's argument for summary judgment. Plaintiff has not pointed the Court to any evidence her performance at Fred's was negatively impacted by the alleged harassment or that Suggs' conduct would have interfered with the job performance of a reasonable employee. *See, e.g.*, Gupta, 212 F.3d at 586 (concluding a reasonable employee would not have avoided the harasser or suffered depression and anxiety as the plaintiff did); Dorsey, 2012 WL at *11 (noting that although the plaintiff's complaint alleged that the harassing "conduct 'interfere[d] with her ability to do her job'…she fails to offer any facts in support of how her job performance was affected"); Price v. Roanoke City Bd. of Educ., No. 3:06-cv-742, 2007 WL 3171376, at *5 (M.D.Ala. Oct. 26, 2007) (observing that although the plaintiff may have changed the time she arrived at work to avoid the harasser there was "no evidence…[her] actual

crossing guard duties were affected"). Quite to the contrary, Plaintiff testified that Suggs was "very nice" to her and treated her better than he did other employees. (Doc. 28-5, pp. 93-94, 115-16). Although Plaintiff's embarrassment on her last day at Fred's may have affected her work that particular day, this embarrassment was not caused by anything specifically done by Suggs but resulted from her co-workers' speculative inquiries about her relationship with Suggs.

Addressing the final factor in the objective component to the analysis of a sexual harassment claim, the Court is not convinced Suggs harassed Plaintiff frequently enough for his behavior to be severe or pervasive. Plaintiff worked at Fred's for slightly over three months, although Suggs was away from work for some of that time recovering from an injury. (Doc. 28-5, p. 106). Plaintiff broadly alleges that Suggs would say "something out of the way" to her "every day," (id. at 100), but such an allegation is not sufficiently specific to create a genuine issue of material fact, for the Court has no way to determine whether those comments were sexual or gender-related in nature. Celotex, 477 U.S. at 323; Jones v. Guardsmark, LLC, Civ. Action No. 05-0458, 2006 WL 2536603, at *3 (S.D.Ala. Aug. 31, 2006) (disregarding "six of the seven jokes told, [for] the plaintiff has offered no evidence as to their content, so that they cannot be relied on in determining the existence of an objectively abusive environment"). But even the approximately eight comments from Suggs that were somewhat sexual in

nature do not convince the Court the harassment was pervasive or severe, for "frequent remarks…made about female employees' bodies and sex lives[,] standing alone, do not rise to the level of discrimination under Title VII." Howard v. City of Robertsdale, 168 F. App'x 883, 889 (11th Cir. 2006).

Even if Suggs' unwelcome conduct could be said to occur frequently, the totality of the circumstances leads the Court to conclude that the harassment was not severe or pervasive enough to alter the terms or conditions of Plaintiff's employment. Judged from an objective standpoint, Suggs never touched Plaintiff in a sexual or suggestive manner. He never physically threatened or humiliated her. Although he sometimes made crude jokes and inappropriate comments, the statements were not sexually graphic, and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788 (internal citation omitted). Although Plaintiff did become embarrassed and subsequently quit her job, the Court cannot objectively find that Suggs' conduct was directly responsible for these developments or that an objective person in Plaintiff's position would have resigned.

Because Plaintiff has not shown that Suggs' harassing conduct was so severe or pervasive as to alter the terms or conditions of her employment at

Fred's, the Court grants its motion for summary judgment and dismisses Plaintiff's sexual harassment claim.

### 2. Whether there is a basis for holding Fred's liable for Suggs' conduct

Even if Suggs' behavior had been "sufficiently severe or pervasive to… create a discriminatorily abusive working environment," Fred's motion for summary judgment on the sexual harassment claim would still be granted because Plaintiff has not provided any legal basis for holding the company liable. Where a plaintiff employee does not suffer any "tangible employment action," an employer may raise an affirmative defense to avoid liability for the sexual harassmet claim by establishing two elements: (1) the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) the employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765; *see also* Faragher, 524 U.S. at 807. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. In her response to the summary judgment motion, Plaintiff does not assert that she suffered any tangible employment action, and so the burden now shifts to Fred's to prove the elements of the affirmative

defense. Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001) (applying the "Faragher/Ellerth affirmative defense").

There are two prongs to the first element of the Faragher/Ellerth affirmative defense: a company must (1) use reasonable care to prevent sexual harassment and (2) use reasonable care to promptly correct any harassment. Frederick, 246 F.3d at 1313. An employer's obligation to correct the harassment in a reasonably prompt manner is only implicated once the employer receives adequate notice of the offending conduct. See id. at 1314; Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1297-98 (11th Cir. 2000). One way in which a company might exercise reasonable care to prevent sexual harassment is by implementing an anti-harassment policy with complaint procedures and disseminating the policy to its employees. Id. at 1299. In light of the wide diversity of companies, courts have been reluctant to impose a rigid definition for what constitutes a reasonable complaint procedure, but at a minimum the procedure should allow a victim to report the harassment to someone other than an offending supervisor. Id. at 1298. The complaint procedure in Madray was reasonable because a complainant could speak with the district manager who once a week visited the store where the alleged harassment occurred or call other company representatives as well as a toll-free telephone number outside the chain of command. Id. at 1298-99.

Fred's satisfies its burden on the first element of the Faragher/Ellerth affirmative defense because it had an adequate anti-harassment policy in place and never received notice of Suggs' behavior prior to Plaintiff's leaving her job. Fred's policy outlined a complaint procedure similar to the one in Madray. Employees who wished to report sexual harassment at Fred's could bypass a supervisor who might be the culpable party and directly telephone the district manager or either of two vice presidents. Or employees could bypass the command structure altogether and report harassment via an "Integrity Hotline." The policy also provided a postal address at Fred's corporate office to which written complaints could be sent. (Doc. 32-3, pp. 65-66). Furthermore, Plaintiff concedes that she received a copy of the policy when she started working at Fred's and that she signed a statement indicating she had read the policy. (Doc. 28-5, pp. 88-89, 91-92). And Fred's is not required to show it acted reasonably promptly to correct Suggs' behavior since, as will be addressed below, Plaintiff never complained of his conduct before she left her job.

The Court next turns to the second element of the Faragher/Ellerth affirmative defense and asks whether Plaintiff unreasonably failed to take advantage of the preventative and corrective opportunities available to her. For an employee to reasonably use her employer's complaint procedures to report sexual harassment she must (1) complain to an appropriate person designated to

receive complaints and (2) sufficiently articulate her complaint to put the employer on notice of the harassment. Olson v. Lowe's Home Centers, Inc., 130 F. App'x 380, 389-90 (11th Cir. 2005); *see also* Coates v. Sudor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999) (per curiam). If an employer establishes procedures for employees to report sexual harassment and designates specific individuals to receive complaints, "then 'it is incumbent upon the employee to utilize the procedural mechanisms established by the company.'" Madray, 208 F.3d at 1300 (quoting Farley v. Amer. Cast Iron Pipe, 115 F.3d 1548, 1554 (11th Cir. 1997)). By setting forth the specific procedures to take in reporting harassment, an employer has through its policy "answered the question of when it would be deemed to have notice of the harassment" and thereby become responsible for taking corrective action. Coates, 164 F.3d at 1364; *see also* Madray, 208 F.3d at 1300. Thus, in most cases, speaking informally to someone whom the policy had not designated to receive sexual harassment complaints would be insufficient to put an employer on notice. Madray, 208 F.3d at 1300.

Fred's has also met its burden of proof on this second element of the affirmative defense. Plaintiff's own deposition testimony is that she never made any attempt to report Suggs' conduct while she was working at Fred's.[4] It was

---

[4] On the night of the telephone call from Suggs' wife, Plaintiff evidently discussed the call with two of her co-workers. (Doc. 28-5, p. 109). However, there is no evidence before the Court that Plaintiff informed them she was the victim of Suggs' harassment,

only after quitting her job that she telephoned Fred's and left a message for Bob Langreder with an unidentified female employee at the Moultrie store, which he only visited once or twice a week. (Doc. 28-5, pp. 89-91, 113-15; Doc. 27-4, ¶3). Langreder never received the message, and in any case this means of making a complaint was clearly not one of the procedures listed in Fred's anti-harassment policy. (Id. at ¶5).

And there was no justifiable excuse for Plaintiff not to follow the reporting procedures or avail herself of more reasonable means to contact Langreder. Judging by Plaintiff's Facebook posts on the day after she quit her job, she had internet access and could reasonably have discovered the designated procedure for reporting sexual harassment even if she had mislaid Fred's anti-harassment policy. (Ex. 10 to Plaintiff's Deposition, Doc. 32-3). Even if Plaintiff did not report Suggs earlier because she was afraid of Langreder, as she claims, (Doc. 28-5, p. 114), subjective fears, standing alone, will not excuse an employee's failure to place her employer on notice of harassment. *See* Speigner v. Shoal Creek Drummond Mine, 402 F. App'x 428, 432 (11th Cir. 2010); Lepera v. Cagle's, Inc., 168 F. App'x 917, 919 (11th Cir. 2006). Therefore, the Court finds that Plaintiff unreasonably failed to comply with the complaint procedures under Fred's policy

---

and in any event these co-workers were not the designated persons under Fred's anti-harassment policy to receive harassment complaints.

for reporting sexual harassment and there is no basis for holding Fred's liable for any sexual harassment by Suggs.

Even assuming *ad arguendo* Plaintiff could be said to have contacted Langreder by leaving a telephone message for him at the Moultrie store, the wording of her message was hardly sufficient to put Fred's on notice of a sexual harassment complaint. There was nothing in Plaintiff's message to indicate she was the victim of sexual harassment. Vague or ambiguous comments, even when made to a person designated to hear complaints, are insufficient to put an employer on notice. *See, e.g.*, Madray, 208 F.3d at 1300-02; Coates, 164 F.3d at 1364-65. "[W]orkplace discrimination…cannot be [corrected] without the cooperation of the victims." Id. at 1366.

Because Fred's has shown that Plaintiff failed to complain of Suggs' conduct using a designated procedure and did not articulate a complaint sufficient to put the company on notice of sexual harassment, the Court finds that Fred's is entitled to the Faragher/Ellerth affirmative defense and grants its summary judgment motion on the sexual harassment claim.

### B.   Constructive Discharge Claim

The Court also grants Fred's motion for summary judgment on Plaintiff's claim to have been constructively discharged from her job. "[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment

requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." Henson v. City of Dundee, 682 F.2d 897, 907 (11th Cir. 1982) (internal quotation and citation omitted). To establish a constructive discharge claim, "a plaintiff must demonstrate that her working conditions were so intolerable that a reasonable person in her position would be compelled to resign." Morgan v. Ford, 6 F.3d 750, 755-56 (11th Cir. 1993) (internal quotation and citation omitted). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001). Thus, where a plaintiff cannot sustain a claim for hostile work environment sexual harassment, her claim for constructive discharge will normally also fail. Matthews v. City of Gulfport, 72 F. Supp. 2d 1328, 1338 (M.D.Fla. 1999).

"A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996). Included within "an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (emphasis in original). In Kilgore the court affirmed the dismissal of the constructive discharge claim because the plaintiffs notified the

employer of the alleged sexual harassment on a Friday but refused to be interviewed the following Tuesday for the investigation, thus leaving their jobs before corrective action could take place. 93 F.3d at 754. Similarly, in Matthews v. City of Gulfport, the court noted that "an employee has the responsibility to act reasonably before choosing to resign, and then labeling that resignation as a constructive discharge." 72 F. Supp. 2d at 1338. The plaintiff's constructive discharge claim was dismissed because she quit her job after failing to report further offenses as she had been directed to do. Id. at 1339.

Without restating all of the alleged instances of Suggs' harassing conduct, the Court finds that Plaintiff's working conditions were not so intolerable that a reasonable person would have been forced to resign. Plaintiff has not presented any evidence that Suggs touched her in a sexual manner or made sexually-graphic comments to her. He never propositioned her. Although Suggs did sometimes engage in vulgar humor, share inappropriate details from his marriage, and flirt with Plaintiff, this behavior would not have forced a reasonable employee to quit her job. The constructive discharge claim must be dismissed.

But even if Plaintiff's working conditions had been intolerable, she acted unreasonably in failing to afford Fred's an opportunity to remedy the situation. She never attempted to report Suggs' conduct until *after* she had quit her job, a decision that was clearly unreasonable and insufficient to support a constructive

discharge claim. Plaintiff was even more unreasonable than the employees in Kilgore who at least reported the harassment before resigning, even though they did not give their employer enough time to rectify the problem. 93 F.3d at 754.

In sum, a reasonable employee in Plaintiff's position would not have found the working conditions at Fred's so intolerable as to have been forced to resign or resigned before the company could address the issue, and this Court grants Fred's motion for summary judgment on the constructive discharge claim.

### C. Retaliation Claim

Plaintiff's retaliation claim must also be dismissed. There are three elements to a *prima facie* retaliation claim under Title VII: (1) a plaintiff must have participated in an activity protected under Title VII; (2) she suffered some adverse employment action; and (3) there was a causal connection between participating in the protected activity and the employment action. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999). Fred's has provided a compelling argument based on the law and the undisputed factual record for why Plaintiff has not proven her retaliation claim. However, because Plaintiff has failed to respond to Fred's summary judgment motion on this claim, she has abandoned the claim, and it is dismissed. *See* Resolution Trust v. Dunmar, 43 F.3d 587, 599 (11th Cir. 1995) (stating that "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied

27

upon in summary judgment are deemed abandoned"). The Court will not devise arguments for the parties. *See* <u>Solutia, Inc. v. McWane, Inc.</u>, 672 F.3d 1230, 1239 (11th Cir. 2012).

## IV.    Conclusion

Based on the foregoing, the Court grants Fred's Motion for Summary Judgment (Doc. 27). Plaintiff's claims are dismissed with prejudice, and this action will be removed from the Court's docket.

**SO ORDERED**, this the 11th day of December, 2013.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

scr